_____
Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
June 03, 2019

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re: | ) Case No.: 19-12300-MKN |
| | ) Chapter 11 |
| CWNEVADA LLC, | ) |
| | ) Date:   May 15, 2019 |
| Debtor. | ) Time:   10:30 a.m. |
| _____ | ) |

**ORDER REGARDING CREDITOR 4FRONT ADVISORS LLC'S MOTION TO DISMISS BANKRUPTCY PETITION OR, ALTERNATIVELY, MOTION FOR RELIEF FROM THE AUTOMATIC STATY TO ALLOW RECEIVERSHIP AND CONTEMPT PROCEEDINGS TO CONTINUE[1]**

On May 15, 2019, the court heard Creditor 4Front Advisors LLC's Motion to Dismiss Bankruptcy Petition or, Alternatively, Motion for Relief from the Automatic Stay to Allow Receivership and Contempt Proceedings to Continue ("Dismissal Motion"). The appearances of counsel were noted on the record. After arguments were presented, the matter was taken under submission.

**BACKGROUND**

On April 16, 2019, a voluntary petition for Chapter 11 reorganization ("Petition") was filed by CWNevada LLC ("Debtor"). (ECF No. 1). Attached to the Petition is a "Resolution Authorizing Bankruptcy" that identifies BCP Holding 7, LLC ("BCP Holding") as managing

_____

[1] In this Order, all references to "ECF No." are to the number assigned to the documents filed in the instant case, or any other specifically identified case, as the documents appear on the dockets maintained by the clerk of court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "Local Rule" are to the Local Rules of Practice for this bankruptcy court. All references to "FRE" are to the Federal Rules of Evidence.

member of the Debtor, and that authorizes BCP Holding to seek Chapter 11 relief for the Debtor. The Petition filed on behalf of the Debtor is signed by Brian C. Padgett ("Padgett") as manager of BCP Holding, and by Michael D. Mazur, as the Debtor's general counsel.

The voluntary Petition is a "skeleton" petition inasmuch as it is not accompanied by a schedule of assets and liabilities ("Schedules"), a statement of financial affairs (SOFA"), or any of the initial information required to obtain bankruptcy relief.  Moreover, the Petition is not accompanied by a "creditor matrix" setting forth the names and addresses of the Debtor's creditors.  The Petition is accompanied by an unsigned List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders ("20 List").  (ECF No. 4).  Only ten creditors are identified on the 20 List.[2]

On the same day the skeleton Petition and 20 List were filed, a Notice of Chapter 11 Bankruptcy Case ("Bankruptcy Notice") was issued by the clerk of the court informing creditors that a meeting of creditors would be held on May 16, 2019.  (ECF No. 3).  Because a creditor matrix was never filed by the Debtor, it appears that the Bankruptcy Notice was served only on the creditors appearing on the 20 List.  (ECF No. 12).

On April 17, 2019, an Ex Parte Application for Order Authorizing Rule 2004 Examination ["2004 Exam"] of Brian C. Padgett ("2004 Exam Request") was filed by The CIMA Group, LLC ("CIMA Group").  (ECF No. 8).  On April 19, 2019, the clerk of the court signed an order granting the request pursuant to Local Rule 5075(a)(2)(L) because the 2004 Exam Request sought to conduct the examination more than fourteen days later and did not include a request for production of documents ("CIMA 2004 Order").  (ECF No. 10).  On the same date, CIMA Group filed a 2004 Exam notice which included a Subpoena for Rule 2004 Examination ("2004 Subpoena") that required the witness to produce various documents.  (ECF

---

[2] The absence of a creditor matrix is significant because bankruptcy relief depends on proper notice being given to creditors and other parties in interest.  Moreover, a "creditor" under Section 101(10)(A) includes any entity that has a "claim" against the bankruptcy estate on the date the bankruptcy petition is filed.  Under Section 101(5)(A), a claim includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured…"

No. 11).[3]

On April 23, 2019, 4Front Advisors LLC ("4Front") filed the instant Dismissal Motion seeking dismissal of the Chapter 11 case based on Section 305(a)(1),[4] or, Section 1112(b).[5]  In the alternative, 4Front seeks relief from the automatic stay under Section 362(d) to allow it to proceed with collection activities under non-bankruptcy law.  Numerous documents are attached to the Dismissal Motion and marked as exhibits "1" through "24."  (ECF No. 18).  In support of the Dismissal Motion, 4Front filed the declarations of Kris Krane ("Krane Declaration")[6] and

---

[3] Local Rule 2004(c) provides as follows: "Production of documents may not be obtained via an order under Fed. R. Bankr. P. 2004.  Production of documents may, however, be obtained via subpoena as provided by Fed. R. Civ. P. 45(a)(1)(C), as adopted by Fed. R. Bankr. P. 9016."  (Emphasis added.)  It appears that the 2004 Subpoena commands both testimony and production of documents based on the CIMA 2004 Order.  The latter command appears to run afoul of Local Rule 2004(c).  In addition, Local Rule 5075(a)(2) authorizes the clerk of the court to sign various orders on behalf of the court for certain matters, including 2004 Exam requests. That authorization applies to "[o]rders authorizing examinations to be taken under Fed. R. Bankr. P. 2004 if the date set for examinations is set on not less than fourteen (14) days' notice and the request for examination does not include a request for production of documents.  Orders that do not meet these requirements and orders under Fed. R. Bankr. P. 2004(d), must be signed by a judge…"  Local Rule 5075(a)(2)(L) (emphasis added).  The language of Local Rule 5075(a)(2)(L) is simply inconsistent with the language of Local Rule 2004(c) that precludes a production of documents from being obtained through an order authorizing a 2004 Exam.  As a party in interest, CIMA Group is permitted to conduct a 2004 Exam of the Debtor's principal and should not be whipsawed, of course, between two poorly drafted local rules.  CIMA Group has noticed a motion to be heard on June 19, 2019, if necessary, to address compliance with the CIMA 2004 Order and 2004 Subpoena.  (ECF Nos. 70 and 74).

[4] Section 305(a) provides that a bankruptcy court, after notice and a hearing, may dismiss a bankruptcy case at any time if "the interests of creditors and the debtor would be better served by such dismissal…"  11 U.S.C. § 305(a)(1).

[5] Section 1112(b) provides that a bankruptcy court, after notice and a hearing, shall dismiss a Chapter 11 case, or convert it to Chapter 7, for cause, whichever is in the best of creditors and the estate.  See 11 U.S.C. § 1112(b)(1).  Examples of "cause" include "gross management of the estate."  Id. at § 1112(b)(4)(B).  To avoid dismissal or conversion, a party in interest must establish, inter alia, that there is a reasonable justification of the act or omission constituting cause, and that the act or omission will be cured within a reasonable amount of time. Id. at § 1112(b)(2)(B).

[6] Through the written testimony of its co-founder, 4Front maintains that it is a "nationally recognized consultant in the legal cannabis industry."  Krane Declaration at ¶ 5.  4Front apparently entered into an agreement with the Debtor on March 10, 2014, to provide consulting

Cory L. Braddock ("Braddock Declaration").[7]  (ECF Nos. 20 and 21).[8]

On April 25, 2019, a combined joinder in the Dismissal Motion was filed on behalf of Highland Partners NV LLC, MI-CW Holdings NV Fund 2 LLC, and MI-CW Holdings LLC (collectively "Highland Partners"), as well as by Green Pastures Fund, LLC Series 1 (CWNevada, LLC), Jakal Investments, LLC, Green Pastures Group, LLC, Jonathan S. Fenn Revocable Trust, and Growth Properties, LLC (collectively "Green Pastures").  (ECF No. 26). In support of that combined joinder ("Highland Joinder"), Highland Partners and Green Pastures filed the declarations of David J. Malley, Esq. ("Malley Declaration"), Christopher R. Miltenberger, Esq. ("Miltenberger Declaration"), and Brandon Kanitz ("Kanitz Declaration"). (ECF Nos. 27, 28, and 29).

On April 26, 2019, a joinder in the Dismissal Motion was filed on behalf of Timothy Smits Van Oyen ("Van Oyen").  (ECF No. 37).

On May 2, 2019, a joinder in the Dismissal Motion was filed on behalf of MC Brands, LLC ("MC Brands").  (ECF No. 47).

On May 7, 2019, a limited joinder in the Dismissal Motion was filed on behalf of The CIMA Group ("CIMA Joinder"), to which is attached copies of three documents marked as exhibits "1" through "3."  (ECF No. 50).

On May 7, 2019, Debtor filed an opposition to the Dismissal Motion ("Opposition") to

---

services "to assist [Debtor] in applying for highly valuable and competitive licenses to operate sate-legal marijuana facilities in Nevada."  Id. at ¶ 6.  In addition to that assistance, 4Front apparently provided "consulting services relating to the design and operation of successful retail cannabis dispensaries as permitted under Nevada state law."  Id. at ¶ 7.

[7] Through the written testimony of its legal counsel, 4Front maintains that it obtained an arbitration award against the Debtor that it seeks to confirm in an action pending in "Nevada state court."  Braddock Declaration at ¶¶ 3, 4 and 5.  Based on the arbitration award, 4Front apparently filed an application for the appointment of a receiver ("Receivership Application"), the hearing on which was continued by the Eighth Judicial District Court, Clark County, Nevada ("State Court") on several occasions and eventually set for April 17, 2019.  Id. at ¶¶ 6 through 13.  The State Court apparently entered an order requiring the Debtor to show cause on May 6, 2019, why it should not be held in contempt for violating a prior order.  Id. at ¶ 14.

[8] Paragraphs 17 through 39 of the Braddock Declaration offer authentication under FRE 901 of the twenty-four exhibits attached to the Dismissal Motion.

which is attached four documents marked as exhibits "A" through "D." (ECF No. 51). The Opposition is supported by the Declaration of Brian C. Padgett ("Padgett Declaration"). (ECF No. 52). On the same date, Debtor filed oppositions to the Highland Joinder, as well as the joinders filed by Van Oyen and MC Brands. (ECF Nos. 54 and 55).

On May 8, 2019, Debtor filed an opposition to the CIMA Joinder ("Additional Opposition"). (ECF No. 56).

On May 8 and May 9, 2019, Debtor filed a request for judicial notice ("RJN") of numerous documents marked as exhibits "A" through "O." (ECF Nos. 57 and 60). Exhibits "A" through "J" apparently consist of copies of the "Register of Actions" or list of docket entries for proceedings of public record pending in State Court, and in this bankruptcy court.[9] Exhibits "K" through "O" consist of documents that were not, until now, of public record.[10]

On May 13, 2019, 4Front filed a reply in support of the Dismissal Motion ("4Front Reply"), to which is attached five documents marked as Exhibits "A" through "E." (ECF No. 68). On the same date, Highland Partners filed a reply in support of the Highland Joinder ("Highland Reply"). (ECF No. 69). On the same date, CIMA Group filed a reply in support of the CIMA Joinder ("CIMA Reply"), to which is attached a single document marked as exhibit "1." (ECF No. 71).[11]

---

[9] The court can take judicial notice under FRE 201 of the documents filed in the state court proceedings, as well as in this bankruptcy court. See U.S. v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980); Conde v. Open Door Mktg., LLC, 223 F. Supp. 3d 949, 970 n.9 (N.D. Cal. 2017); Green v. Williams, 2012 WL 3962458, at *1 n.1 (D. Nev. Sept. 7, 2012); Bank of Am., N.A. v. CD-04, Inc. (In re Owner Mgmt. Serv., LLC Trustee Corps.), 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015).

[10] Exhibits "K" through "N" appear to be authenticated under FRE 901 by paragraphs 13, 12, 11, and 10 of the Padgett Declaration. Exhibit "O" is a copy of a document entitled "Cannex Notice of Meeting and Management Information Circular Relating to the Special Meeting of Security Holders to be Held on April 18, 2019" ("Cannex Notice"), the source of which is not addressed by the Padgett Declaration.

[11] The Office of the United States Trustee ("U.S. Trustee") is a component of the United States Department of Justice ("Justice Department") and exercises oversight responsibilities in bankruptcy cases through regional offices located throughout the United States. See 28 U.S.C. § 586. The U.S. Trustee has not joined in the instant Dismissal Motion, nor has it filed a statement

**DISCUSSION**

Debtor is in the business of cultivating, producing, and distributing medical and recreational marijuana ("Marijuana Business").  See Padgett Declaration at ¶¶ 4-5.  It also is in the business of producing and distributing products that contain cannabidiol ("CBD") which apparently are used, *inter alia*, to treat epilepsy ("CBD Business").  Id. at ¶ 6.  Debtor apparently operates or once operated marijuana cultivation, production, or dispensary facilities at up to five Nevada locations: three in Las Vegas, one in North Las Vegas, and one in Pahrump.  See CWNevada Investor Update, February 2016, attached as Exhibit "1" to Dismissal Motion, at pages 13-17; see also Benchmark Insurance Company - Workers Compensation and Employers Liability Insurance, 04/26/2019  to 04/26/2020, attached as Exhibit "N" to RJN and as Exhibit "A" to Opposition.  Debtor's health plan coverage apparently encompasses 54 subscribers.  See Health Plan of Nevada Bill Statement for May 2019, attached as Exhibit "M" to RJN and as Exhibit "B" to Opposition.  Debtor apparently made a payment of $81,850 to the Nevada Department of Taxation ("NDOT") on April 23, 2019.  See Marijuana Tax Return dated March 29, 2019, attached as Exhibit "K" to RJN and as Exhibit "D" to Opposition.[12]

Debtor's business operations apparently are authorized under Nevada law.[13]  Debtor's Marijuana Business is prohibited under federal law by provisions of the Controlled Substances Act, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 812(c), Schedule I(c)(10) [Marihuana] and Schedule

---

expressing any view on the merits of this matter.  Likewise, the U.S. Trustee did not enter an appearance at the hearing in this matter.  Similarly, neither the Nevada Department of Taxation, Nevada Department of Health and Human Services, nor any other Nevada agency has joined in the Dismissal Motion, or expressed any view.  Nor did any Nevada governmental agency enter an appearance at the hearing.

[12] That exhibit is a photocopy that is obscured by a "sticky note" reflecting someone's handwriting and also what appears to be a receipt stapled to the original of the document.  That receipt indicates that the NDOT received a total of $81,850 consisting of a check in the amount of $12,000, and cash in the amount of $69,850.00.

[13] Nevada is one of many states that has enacted legislation to decriminalize marijuana.  See generally NLJ Staff, *The Elephant in Nevada's Hotel Rooms: Social Consumption of Recreational Marijuana, A Survey of Law, Issues, and Solutions*, 2 Nev.L.J. Forum 99 (2018) [hereafter "NLJ Survey"].

6

I(c)(17) [Tetrahydrocannibinols].[14]  Debtor's CBD Business, however, may no longer be prohibited under federal law as a result of the Agriculture Improvement Act of 2018, Pub. L. 115-334, 132 Stat. 4490.

The Agriculture Improvement Act became effective on December 20, 2018, when the bill was signed into law.  The Act amended the term "Marihuana" under the Controlled Substances Act to exclude hemp "as defined under section 1639o of Title 7."  See 21 U.S.C. § 802(16)(B).  The Act also amended Schedule I(c)(17) of the Controlled Substances Act to exclude from the definition of "Tetrahydrocannabinols" the "tetrahydrocannabinols in hemp (as defined under section 1639o of Title 7)."  See 21 U.S.C. § 812(c), Schedule I(c)(17).  Under 7 U.S.C. § 1639o(1), the term hemp "means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannibinol concentration of not more than 0.3 percent on a dry weight basis."  (Emphasis added.)  Because products derived from hemp plants containing restricted concentrations of tetrahydrocannabinols ("THC"), which is the active ingredient in marijuana, are no longer in violation of the Controlled Substances Act, the Food and Drug Administration ("FDA") apparently will assume a regulatory role for such products.[15]

---

[14] Violations of the Controlled Substances Act are subject to criminal prosecution, with a range of penalties including incarceration and fines.  See 21 U.S.C. §§ 841(b)(1)(A)(vii), 841(b)(1)(B)(vii), 841(b)(1)(C), and 841(b)(1)(D).  See generally Brian T. Yeh, *Drug Offenses: Maximum Fines and Terms of Imprisonment for Violation of the Federal Controlled Substances Act and Related Laws,* Congressional Research Service, January 20, 2015, available at https://fas.org/sgp/crs/misc/RL30722.pdf (last visited May 31, 2019).  Persons who attempt or conspire in a violation of the Controlled Substances Act also may be subject to prosecution.  See 21 U.S.C. § 846.  Compare 18 U.S.C. § 2(a) (a person who aids, abets, counsels, commands, induces or procures the commission of an offense against the United States is punishable as a principal).  The statute of limitations for the Justice Department to prosecute a violation of the Controlled Substances Act is five years.  18 U.S.C. § 3282.  See, e.g., United States v. Mancuso, 718 F.3d 780, 787 n.1 (9th Cir. 2013) (five-year statute of limitations applies to federal prosecution under Controlled Substances Act).

[15] See Statement from FDA Commissioner Scott Gottlieb, M.D., on new steps to advance agency's continued evaluation of potential regulatory pathways for cannabis-containing and

Under these circumstances, the portion of the Debtor's operations devoted to the Marijuana Business appears to be in violation of federal law, while the portion devoted to the CBD Business might be excluded from the Controlled Substances Act if the CBD products sold by the Debtor are derived from the type of hemp permitted under federal law.  Notwithstanding its operations of these two businesses in accordance with Nevada law, Debtor apparently defaulted on payment of many of its obligations, including the claim of 4Front.  Before 4Front's Receivership Application could be heard by the State Court, however, Debtor filed its voluntary Chapter 11 Petition.

No one disputes that the Debtor is a limited liability company formed under Nevada law. A limited liability company is treated as a "corporation" under Section 101(9)(A)(iv), and therefore is a "person" as defined under Section 101(41).  See AE Rest. Assocs. LLC v. Giampietro (In re Giampietro), 317 B.R. 841, 844 n.3 (Bankr. D. Nev. 2004).[16]  Under Section 109(a), a person that resides, has a place of business, or has property in the United States, may be a debtor in bankruptcy.  Because the Debtor in this case resides and has a place of business in Nevada, it is eligible under Section 109(a) to file a bankruptcy petition.  Additionally, under Section 101(15), a person is included in the term "entity."  Under Section 301(a), a voluntary bankruptcy petition commencing a case may be filed by an entity.  Because the Debtor is both a person and an entity, it clearly was permitted under Section 301(a) to file its voluntary Chapter 11 Petition.

As a result of filing a bankruptcy petition, the automatic stay arose under Section 362(a), applicable to all entities, barring various acts and actions from being taken or continued against the Debtor or property of the bankruptcy estate.  See 11 U.S.C. § 362(a)(1 through 8).  Property of the bankruptcy estate includes, *inter alia*, all legal and equitable interests of the Debtor in

cannabis-derived products, April 2, 2019, available at https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb (last visited May 31, 2019).

[16] In Giampietro, the bankruptcy court determined that Nevada limited liability companies are subject to the alter ego doctrine that is applied to pierce the veil of Nevada corporations.  317 B.R. at 846-48.   In 2017, the Nevada Supreme Court reached the same conclusion.  See Gardner v. Eighth Judicial District Court, 405 P.3d 651, 656 (Nev. 2017).

property as of the commencement of the case.  See 11 U.S.C. § 541(a)(1).[17]  So when the

Chapter 11 petition was filed in the instant case, 4Front, Highland Partners, Green Pastures,

CIMA Group, MC Brands, Van Oyen, and all other creditors were barred from continuing with

their State Court litigation against the Debtor, or engaging in any other acts against the Debtor or

any property of the Debtor.  See generally Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,

997 F.2d 581, 585 (9th Cir. 1993).[18]

    A fundamental purpose for allowing businesses and individuals to reorganize in Chapter

11 is to preserve jobs, pay creditors as much as they would receive in a Chapter 7 liquidation,

and to preserve the investment equity of shareholders.  See U.S. v. Whiting Pools, Inc. (In re

Whiting Pools, Inc.), 462 U.S. 198, 203, 103 S.Ct. 2309, 2312-13 (1983); In re Mohave Agrarian

Group, LLC, 588 B.R. 903, 915 (Bankr. D. Nev. 2018).  Because a voluntary Chapter 11 debtor

remains in possession of property of its bankruptcy estate, and because it has the rights, powers

and duties of a bankruptcy trustee, see 11 U.S.C. § 1107(a), a Chapter 11 debtor in possession

has a fiduciary responsibility to all creditors of the bankruptcy estate.  See Woodson v.

Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 614 (9th Cir. 1988) ("[Debtor's] failure

to notify his creditors of the $1 million in a timely fashion is especially troubling because

[Debtor] is not an ordinary litigant.  As debtor in possession he is the trustee of his own estate

---

[17] The Bankruptcy Code makes clear that it is the commencement of a case under
Sections 301, 302 and 303 that "creates an estate."  11 U.S.C. § 541(a).  Prior to the
commencement of a case, a debtor simply holds interests that may ultimately become property of
the bankruptcy estate.  After a bankruptcy estate comes into existence, it may thereafter acquire
interests in additional property that also become property of the bankruptcy estate.  See 11
U.S.C. § 541(a)(7).  Amongst the "legal or equitable interests of the debtor in property as of the
commencement" of a bankruptcy case, see 11 U.S.C. § 541(a)(1), are any claims or causes of
action that the debtor may assert against any parties.  See Sierra Switchboard Co. v.
Westinghouse Elec. Corp., 789 F.2d 705, 707 (9th Cir. 1986).

[18] This includes taking possession of or exercising control over property of the
bankruptcy estate, or enforcing a lien against property of the estate.  See 11 U.S.C. §§ 362(a)(3
and 4).  Even if a party is not a creditor having a claim against the Debtor, it is still an "entity" to
which the automatic stay applies.  The automatic stay described in Sections 362(a)(1, 2, 3 and 6)
does not apply to certain activity, such as an action by a governmental unit to enforce the unit's
police and regulatory power.  See 11 U.S.C. § 362(b)(4).

9

and therefore stands in a fiduciary relationship to his creditors."). A debtor in possession also is required to manage and operate the property in its possession according to the requirements of state law. See 28 U.S.C. § 959(b).

Creditors who oppose a Chapter 11 debtor's efforts can object at any time during the case and to any plan of reorganization that might be proposed. A Chapter 11 debtor in possession typically has an exclusive period of 120 days to propose a plan of reorganization, after which time a creditor may file its own plan. See 11 U.S.C. § 1121(b). As a general rule, a Chapter 11 debtor can propose a plan of reorganization to which all of its creditors agree, and such a consensual plan is confirmed without the necessity of a "cramdown" of plan treatment.[19] If all creditors do not agree, then the plan may be confirmed through cramdown only if the treatment of the objecting creditors' claims is "fair and equitable." 11 U.S.C. § 1129(b). It is under this legal framework that the court addresses this Dismissal Motion.[20]

### 1. **The Arguments of the Parties.**

After describing a litany of events that allegedly preceded the commencement of this Chapter 11 proceeding, see Dismissal Motion at 2:6 to 10:20, 4Front offers eight separate, but overlapping arguments in favor of its request: (1) that Debtor is ineligible for relief under bankruptcy law, id. at 10:25 to 13:20, (2) that all parties are better served by abstention under Section 305(a) through dismissal of the case, id. at 13:23 to 14:10, (3) that appointment of a receiver in State Court offers a superior forum to resolve disputes, id. at 14:12 to 15:13, (4) that the Debtor commenced the Chapter 11 proceeding to frustrate creditor rights, id. at 15:15 to 16:2, (5) that economy and efficiency supports abstention by dismissal, id. at 16:4 to 17:10, (6) that

---

[19] "Cramdown" is simply a description of what is permitted in bankruptcy: if creditors and interest holders do not agree to the proposed treatment of their claims, the court may confirm a proposed plan over their objections if certain conditions are met.

[20] Bankruptcy permits individuals and non-individuals to obtain a discharge of their personal liability to pay a debt. The Bankruptcy Code provides the statutory framework for which a discharge may be obtained. No one disputes, however, that a party that files for bankruptcy protection does not have a constitutional right to receive a discharge of debts. See U.S. v. Kras, 409 U.S. 434, 446, 93 S.Ct. 631, 638 (1973).

dismissal is warranted under Section 1112(b) because of bad faith,[21] id. at 17:13 to 18:3, (7) that dismissal is warranted based on the doctrine of unclean hands, id. at 18:5-24, and (8) that the automatic stay should be lifted to permit the actions in State Court to proceed, id. at 18:27 to 19:19.  MC Brands simply joins in all of the arguments raised by 4 Front.  Highland Partners, Green Pastures, and Van Oyen join in the arguments based on Section 305(a) and Section 1112(b).  See Highlands Joinder at 6:15-27 and 7:2 to 10:20; Van Oyen Joinder at 2:1-2.  The "joinder" filed by CIMA Group, however, seeks the appointment of a Chapter 11 trustee under Section 1104(a) in the event the case is not dismissed under Section 1112(b).[22]  See CIMA Joinder at 8:2 to 12:2.[23]

Debtor does not dispute the characterization of most of the events leading up to the filing of its Chapter 11 petition.  See Opposition at 2:26 to 4:4.  Instead, it offers eight separate but overlapping arguments of its own: (1) that a Chapter 11 plan will be proposed in good faith, see Opposition at 4:12 to 6:2, (2) that the Justice Department is currently barred from expending funds to enforce the marijuana restrictions applicable under the Controlled Substances Act, id. at 6:5 to 7:13, (3) that abstention through dismissal under Section 305(a) will not better serve the interests of the Debtor, id. at 7:14 to 9:3, (4) that the Debtor is in the process of establishing

---

[21] Although 4Front seeks dismissal of the case under Section 1112(b), it does not request appointment of a Chapter 11 trustee under Section 1104(a).

[22] As previously mentioned, see discussion at 3, supra, 4Front seeks dismissal under Section 305(a), or, in the alternative, Section 1112(b).  A decision on a motion to dismiss under Section 1112 must be rendered no later than fifteen days after a hearing commences, unless the moving party consents or compelling circumstances otherwise requires.  See 11 U.S.C. § 1112(b)(3).

[23] Although CIMA Group's request for the appointment of a Chapter 11 trustee first appeared in its joinder filed the day before the Debtor's opposition was due, see CIMA Joinder at 6:16 to 12:2, Debtor's written opposition to that joinder does not discuss whether appointment of a trustee is appropriate.  See Additional Opposition at 2 ("Debtor hereby adopts all previous arguments made in their Opposition to 4Front Advisors, LLC's Motion as if fully set forth herein…").  In any event, the bankruptcy court may appoint a Chapter 11 trustee *sua sponte*, see Fukutomi v. U.S. Trustee (In re Bibo, Inc.), 76 F.3d 256 (9th Cir. 1996), if it determines the appointment of a Chapter 11 trustee to be in the interests of creditors, equity security holders, and other interests of the estate.  See 11 U.S.C. § 1104(a)(2).

relationships with banks that currently do business with 4Front, id. at 9:5-12, (5) that the Debtor has workers compensation, employee health, and automobile insurance in place, and made a tax payment to the NDOT on April 23, 2019, id. at 9:14-27, (6) that the doctrine of unclean hands does not bar bankruptcy relief, id. at 10:2-13, (7) that the balance of hardships favor keeping the automatic stay in place, id. at 10:15 to 11:8, and (8) that civil contempt proceedings currently pending in State Court may be exempt from the automatic stay, id. at 11:11-17.

### 2. The Existing Case Law is Distinguishable.[24]

Interspersed amongst the parties arguments are citations to various decisions by other courts suggesting why a marijuana-related bankruptcy case should, or should not, be dismissed. None of those decisions, however, are controlling under the circumstances of the case now before this court.[25]

---

[24] Not surprisingly, a variety of cases have been filed in this court by individual or non-individual debtors that receive or propose to receive income from a source authorized under state law to cultivate or distribute marijuana. See, e.g., In re Warwick Properties, LLC, Case No. 17-15065-MKN (voluntary Chapter 11 limited liability company whose tenant cultivated marijuana on California real property as authorized by California law); In re Perez, Case No. 19-12284-MKN (voluntary individual Chapter 7 debtor apparently employed by a Nevada marijuana dispensary licensed under Nevada law); In re Misle, Case No. 18-15705-BTB (involuntary individual Chapter 7 debtor who receives income from an entity that manages marijuana cultivation facilities under Nevada law); In re Redrock Enterprises, LLC, Case No. 15-13493-ABL (voluntary Chapter 11 by debtor who proposed to lease property to a tenant engaged in marijuana operation under Nevada law); In re Olson, Case No. 17-50081-BTB (Chapter 13 debtor who received rental income from medical marijuana dispensary operating under Nevada law).

[25] Cases involving marijuana-related individual and non-individual debtors have become the boogeyman of bankruptcy jurisprudence. Some courts have shied away, and other courts have approached such cases with caution. The bankruptcy debtor's actual connection to the potential illegal activity – whether direct, indirect, remote, or near – appears to be a significant consideration. It is worth noting, however, that bankruptcy courts have a long history of considering cases involving debtors whose activities and operations have included past, present and possibly ongoing violations of applicable non-bankruptcy, civil and criminal laws. See, e.g., Midlantic Nat'l Bank v. New Jersey Dept. of Envt'l Prot., 474 U.S. 494, 106 S.Ct. 755 (1986)(voluntary Chapter 11 of waste oil processor that possessed leaking containers of cancer-causing substances in violation of state and local law was converted to Chapter 7, rather than dismissed); In re Freedom Industries, Inc., Case No. 14-bk-20017 (Bankr. S.D. W.Va. Jan. 17, 2014)(voluntary Chapter 11 filed by chemical producer after chemical spill contaminated Elk River; Chapter 11 plan of reorganization confirmed even though the debtor and officers were

**A.  The Most Recent Decision of the Ninth Circuit Court of Appeals.**

On May 2, 2019, sixteen days after the Debtor commenced this Chapter 11 proceeding, the Ninth Circuit Court of Appeals ("Ninth Circuit") entered its decision in Garvin v. Cook Investments NW, SPNWY, LLC (In re Cook Investments NW), 922 F.3d 1031 (2019).  That Chapter 11 proceeding was commenced in the bankruptcy court for the Western District of Washington and encompassed five related real estate entities.  One of those entities, Cook Investments NW DARR ("Cook DARR"), leased property to an unrelated third party licensed under Washington law to grow marijuana.  That lease violated, however, the provision of the Controlled Substances Act that prohibited the knowing lease of any space "…for the purpose of manufacturing, distributing, or using any controlled substance…"  21 U.S.C. § 856(a)(1).  The U.S. Trustee filed a motion under Section 1112(b)(1) to dismiss the Chapter 11 proceeding based on gross mismanagement as defined under Section 1112(b)(4)(B).  The bankruptcy court denied the motion on the debtors' representation that an amended plan would include a rejection of the lease with the marijuana grower and payments under the plan therefore would not depend on a source that violates federal law.  See Geiger v. Cook Investments NW, SPNWY, LLC (In re Cook Investments NW), 2017 WL 10716993, at *1 (W.D. Wash. Dec. 18, 2017).  The bankruptcy court gave the U.S. Trustee leave to renew the motion at the time of confirmation of the amended plan.[26]

The debtors filed an amended plan along with a separate motion to reject the marijuana tenant's lease.  The U.S. Trustee objected to confirmation of the amended plan, but not to the

---

subsequently sentenced for criminal violations of the federal Clean Water Act and federal Refuse Act).  See also NCR Staff, *Catholic Dioceses and Orders that Filed for Bankruptcy and Other Major Settlements*, National Catholic Reporter (May 31, 2018), available at https://www.ncronline.org/news/accountability/catholic-diocesese-and-orders-filed-bankruptcy-and-other-major-settlements (last visited May 31, 2019) (listing all Catholic diocese bankruptcy proceedings filed from July 6, 2004 through approximately February 28, 2018, to address sexual abuse claims against clergy).

[26] Although the debtors were the subject of a prior state court judgment that precipitated the Chapter 11 filing, id. at *1, the U.S. Trustee sought dismissal of the bankruptcy case solely under Section 1112(b), and not dismissal based on abstention under Section 305(a).

motion to reject the lease.  An order was entered authorizing rejection of the lease.  The U.S. Trustee objected that the amended plan was not proposed in good faith under Section 1129(a)(3), but did not renew the motion to dismiss under Section 1112(b)(1) based on gross mismanagement.  The bankruptcy court overruled the plan objection and confirmed the amended plan under Section 1129(a).[27]  Id. at *1-2.  On appeal, the federal district court affirmed both the plan confirmation order and the order denying the U.S. Trustee's motion to dismiss.  As to dismissal based on gross mismanagement, the district court concluded that the U.S. Trustee had waived the objection by failing to renew the prior motion.  Id. at *3.  The district court also concluded that it was not an abuse of discretion to deny dismissal because the debtors might be able to propose a Chapter 11 plan that does not rely on income from the marijuana lease.  Id. at *4.  The district court emphasized that the debtors' plan of reorganization provided for payment of the single creditor whose judgment would be paid in full from non-marijuana income.  Id.

On further appeal, the Ninth Circuit again affirmed.  In particular, the circuit panel addressed the U.S. Trustee's objection that the debtors' Chapter 11 plan did not meet Section 1129(a)(3) because it had not "been proposed in good faith and not by any means forbidden by law."  The Ninth Circuit held that the good faith requirement under Section 1129(a)(3) "…directs courts to look only to the proposal of a [Chapter 11] plan, not to the terms of the plan."  922 F.3d at 1035.  (Emphasis added).  Because the Debtor's plan had been negotiated during the Chapter 11 proceeding in good faith, it had not been proposed by any means forbidden by bankruptcy or non-bankruptcy law.  Id. at 1033-34.  With respect to any alleged violations of the Controlled Substances Act, the court observed:

> We do not believe that the interpretation compelled by the text [of Section 1129(a)(3)] will result in bankruptcy proceedings being used to facilitate legal violations.  To begin, absent waiver, as in this case, courts may consider gross mismanagement under § 1112(b).  And confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself…There is thus no need to "convert the bankruptcy judge into an ombudsman without portfolio,

---

[27] Section 1129(a) sets forth sixteen separate requirements that generally apply to all Chapter 11 plan proponents seeking to confirm a plan.  Only individual Chapter 11 debtors, however, are subject to the requirements under Section 1129(a)(15).

gratuitously seeking out possible 'illegalities' in every plan," a
result that would be "inimical to the basic function of bankruptcy
judges in bankruptcy proceedings."

Id. at 1036 (citations omitted).[28]  With respect to dismissal for gross management within the

meaning of Section 1112(b)(4)(B), the Ninth Circuit concluded that the U.S. Trustee had waived

the objection by failing to renew its motion at plan confirmation.  The circuit panel reached that

conclusion because the motion was not presented under Section 1112(b)(1) and therefore there

was no opportunity for the bankruptcy court to consider whether any claim of gross

mismanagement could be cured under Section 1112(b)(2).[29]  Id. at 1034.

 While the Ninth Circuit's decision in Garvin is controlling when a good faith objection to

plan confirmation is raised under Section 1129(a)(3), there is no proposed Chapter 11 plan

before the court at this time.  Similarly, the Garvin decision does not address other requirements

for Chapter 11 plan confirmation, such as feasibility under Section 1129(a)(11).[30]  At this stage,

---

 [28] In Chapter 11 and Chapter 13 proceedings, however, bankruptcy judges have been
directed to make an independent determination of whether the statutory requirements for
confirmation of a debtor's proposed plan have been met.  See, e.g., Liberty Nat'l Enters. v.
Ambanc La Mesa Ltd. P'Ship (In re Ambanc La Mesa Ltd. P'Ship), 115 F.3d 650, 653 (9th Cir.
1997) (Chapter 11 plan confirmation); United Student Aid Funds, Inc. v. Espinosa (In re
Espinosa), 559 U.S. 260, 276-77, 130 S.Ct. 1367, 1380-81 (2010) (Chapter 13 plan
confirmation).  See also In re Las Vegas Monorail Co., 462 B.R. 795, 798 (Bankr. D. Nev. 2011)
(Chapter 11); In re Escarcega, 573 B.R. 219, 231 (B.A.P. 9th Cir. 2017) (Chapter 13).
Moreover, federal judges are directed to report to the appropriate United States attorney all the
facts and circumstances of a case in which the judge has reasonable grounds to believe that a
bankruptcy crime or any violation of "other laws relating to insolvent debtors, receiverships or
reorganization plans have been committed, or that an investigation should be had in connection
therewith…"  18 U.S.C. § 3057(a).

 [29] If there are unusual circumstances establishing that conversion or dismissal of a
Chapter 11 case is not in the best interests of creditors and the estate, such relief is prohibited if
the debtor establishes a reasonable likelihood that a plan will be confirmed in a reasonable
amount of time, and, inter alia, that any act constituting cause, including gross mismanagement,
will be cured within a reasonable amount of time fixed by the court.  See 11 U.S.C. §
1112(b)(2)(A and B).

 [30] Section 1129(a)(11) requires a Chapter 11 plan proponent to demonstrate that plan
confirmation "is not likely to be followed by the liquidation, or the need for further financial
reorganization, of the debtor or any successor to the debtor under the plan, unless such
liquidation or reorganization is proposed in the plan."  The Chapter 11 plan proponent must
"demonstrate that any necessary financing or funding has been obtained, or is likely to be

the Debtor wants to remain under the protection of the automatic stay while it tries to formulate a plan of reorganization.  The <u>Garvin</u> panel did not preclude consideration of a motion to dismiss under Section 1112(b)(1), even at plan confirmation, but did not do so only because the U.S. Trustee had waived the ground by failing to renew its prior motion.  So procedurally, the <u>Garvin</u> decision offers no guidance on whether dismissal under Section 1112(b)(1) on the basis of mismanagement under Section 1112(b)(4)(B), or any other ground, would be appropriate in the present case.

On the other hand, the more obvious factual distinction is that the Chapter 11 debtor in <u>Garvin</u> was not engaged in the cultivation, production and distribution of marijuana.  Unlike the debtor in <u>Garvin</u>, this is not a case where proceeds of the Marijuana Business would provide merely "indirect support" for a confirmed plan.[31]  Rather, the Marijuana Business operated by the Debtor appears to be the primary source of the Debtor's revenue and appears to be in clear violation of the Controlled Substances Act.

Perhaps more important is that the <u>Garvin</u> decision does not address whether dismissal independently based on abstention under Section 305(a) is appropriate.  The debtors in <u>Garvin</u> were not subject to multiple state court actions brought by creditors clamoring to enforce their claims against limited assets.  The Debtor in the current case is.

Under these circumstances, the recent decision in <u>Garvin</u> is informative, but neither procedurally nor factually apposite.[32]

---

obtained."  <u>In re Trans Max Techs., Inc.</u>, 349 B.R. 80, 92 (Bankr. D. Nev. 2006).  The Bankruptcy Code "…does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy §1129(a)(11)…But the court must still have a reasonable and credible basis for making the necessary findings…"  <u>Id.</u> (citations and quotations omitted).

[31] <u>See</u> <u>Garvin</u>, 922 F.3d at 1035 ("Because it appears that [debtors' principal] continues to receive rent payments from [the marijuana producer], which provides at least indirect support for the Amended Plan, the [U.S.] Trustee asserts that [the Chapter 11] pan was 'proposed…by…means forbidden by law.'").

[32] A Chapter 11 plan may provide for the liquidation of the assets of the estate, <u>see</u> 11 U.S.C. § 1129(a)(11), but confirmation of a plan does not discharge the debtor if the plan provides for liquidation of all or substantially all property of the estate, the debtor does not

16

### B.  The Remaining Cases Cited by the Parties.

The other cases cited by the parties involved marijuana-related bankruptcy relief under various chapters of the Bankruptcy Code, but under very different circumstances.  Three other non-bankruptcy cases cited by the parties are not persuasive.

### (1)  Chapter 13 Cases.

Relief under Chapter 13 is available only to individuals who are eligible under Section 109(e) and who are willing to devote their future disposable income to the payment of creditors.  Individuals essentially commit to earn income from their labors over time in exchange for a discharge in Chapter 13.  Because individuals cannot be subjected to forced labor, they cannot be placed into Chapter 13 involuntarily.  See 11 U.S.C. § 303(a).

In In re McGinnis, 453 B.R. 770 (Bankr. D. Or. 2011), a Chapter 13 debtor proposed a plan that would be partially funded by the debtor's own marijuana business and rental income derived from other marijuana-related businesses.  After an evidentiary hearing in which the Chapter 13 trustee objected, the court denied confirmation because the plan's reliance on income derived from the marijuana industry violated the good faith requirement under Section 1325(a)(3).[33]  The court further concluded that because the contemplated marijuana operations

---

engage in business after consummation of the plan, and the debtor would be denied a discharge if the case was a case under Chapter 7.  See 11 U.S.C. § 1141(d)(3).  A non-individual entity is not eligible for a discharge in Chapter 7.  See discussion at 23, infra.  A non-individual entity engaged solely in the cultivation, production and distribution of marijuana faces a difficult choice when seeking Chapter 11 relief: if it commits to disposing of its marijuana assets and to not engage in business, it will not receive a Chapter 11 discharge.  If such a non-individual entity does not commit to ceasing operations that are in violation of the Controlled Substances Act, however, its Chapter 11 proceeding may well be subject to dismissal based on gross mismanagement established under Section 1112(b)(4)(B).  The debtors in Garvin had substantial operations that did not violate the Controlled Substances Act and were able to engage in business even after rejecting the marijuana tenant's lease.  Thus, a Chapter 11 discharge was available to the debtors in Garvin and occurred at the time their plan of reorganization was confirmed.  See 11 U.S.C. § 1141(d)(1).

[33] Section 1325(a)(3) parrots the language in Section 1129(a)(3), and requires the court to find that a proposed Chapter 13 plan "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1325(a)(3).

were illegal under both federal and Oregon law,[34] debtor could not satisfy Section 1325(a)(6), which requires proof of a debtor's ability "to make all payments under the plan and to comply with the plan."[35]   The court, however, expressed a willingness to consider confirmation of any amended plan that did not rely on funding from illegal sources of income.  As a result, the court denied plan confirmation but permitted the debtor to file an amended plan.  In the event a timely amended plan was not filed, the court indicated that it would issue an order to show cause for dismissal or conversion to Chapter 7.  Id. at 773-74.[36]

In In re Johnson, 532 B.R. 53 (Bankr. W.D. Mich. 2015), the U.S. Trustee moved to dismiss a Chapter 13 case because part of the debtor's income came from the sale of medical marijuana permitted under Michigan law.  The court credited the debtor's testimony that all plan payments made to the trustee came from his Social Security income but nevertheless concluded that the court could not, and would not, allow the debtor to remain in a bankruptcy case that assisted in the advancement of an illegal activity.  The court, however, did not agree with the U.S. Trustee that dismissal was a foregone conclusion, but instead gave the debtor the option to remain in bankruptcy by ceasing his illegal business operations.  Specifically, the court enjoined the debtor from continuing with his marijuana business, ordered him to destroy all marijuana

---

[34] Oregon law allowed a medical marijuana cultivation operation to be reimbursed for supplies and utility expenditures, but not to obtain a profit from the operation.  453 B.R. at 772-73.  Oregon's non-profit requirement for medical marijuana cultivation businesses perhaps reflected a social policy to provide effective alternatives to traditional medicine, e.g., to address the side effects of chemotherapy, as a treatment for chronic pain, etc.  A similar non-profit requirement for recreational marijuana presumably would not reflect a similar social policy any more than a non-profit requirement for the liquor industry.  With more states authorizing the cultivation, production and distribution of recreational marijuana products, it is clear that the marijuana industry increasingly is based on profit motivations rather than altruism.

[35] Section 1325(a)(6) is the "feasibility" requirement in Chapter 13 that requires the individual debtor to demonstrate that he or she can actually perform the terms of the proposed payment plan.  See KEITH M. LUNDIN & WILLIAM H. BROWN, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 198.1, at ¶ [2], Sec. Rev. June 15, 2004, www.Ch13online.com.

[36] Because the debtor did not file an amended Chapter 13 plan, the case was dismissed after the court issued an order to show cause and the debtor filed a motion for voluntary dismissal.  (McGinnis ECF No. 62).

18

plants, and scheduled a further evidentiary hearing to determine the debtor's compliance with these conditions.  Id. at 59.  The court also provided the debtor with the option to terminate the injunction by moving to dismiss his own case under Section 1307(b).  Id.[37]

In Olson v. Van Meter (In re Olson), 2018 WL 989263 (B.A.P. 9th Cir. Feb. 5, 2018), a Chapter 13 debtor obtained rental income from a marijuana dispensary on real property she proposed to sell under her plan.  The bankruptcy court *sua sponte* dismissed the bankruptcy case because the debtor was accepting rental income during the post-petition period from a source engaged in a business that violated federal law.  On appeal, the bankruptcy appellate panel vacated and remanded the case, stating that the bankruptcy court needed to make more findings of fact and conclusions of law to support dismissal.  In her concurring opinion, Judge Tighe expressed her opinion that "[a]lthough debtors connected to marijuana distribution cannot expect to violate federal law in their bankruptcy case, the presence of marijuana near the case should not cause mandatory dismissal."  Id. at *7.  Judge Tighe also provided additional clarification regarding the detail she believes to be necessary in future rulings involving similar cases:

> I concur in the memorandum and write separately to emphasize (1) the importance of evaluating whether the Debtor is actually violating the Controlled Substances Act and (2) the need for the bankruptcy court to explain its conclusion that dismissal was mandatory under these circumstances.  With over twenty-five states allowing the medical or recreational use of marijuana, courts increasingly need to address the needs of litigants who are in compliance with state law while not excusing activity that violates federal law.  A finding explaining how a debtor violates federal law or otherwise provides cause of dismissal is important to avoid incorrectly deeming a debtor a criminal and denying both debtor and creditors the benefit of the bankruptcy laws.

Id. at *6.

The common theme in all of these Chapter 13 cases is the willingness of the bankruptcy court to allow the voluntary debtor to propose a feasible plan that does not rely on income received through a violation of the Controlled Substances Act.

---

[37] The debtor confirmed a Chapter 13 plan, but his case ultimately was dismissed when he defaulted on his plan payments.  (Johnson ECF No. 87).

1

**(2) Chapter 11 Cases.**

2

Relief under Chapter 11 is available to both individuals and non-individuals, and may be

3

initiated both voluntarily and involuntarily. For individual Chapter 11 debtors, a bankruptcy

4

discharge is obtained only upon completion of payments of a confirmed plan. See 11 U.S.C. §

5

1141(d)(5). For non-individual Chapter 11 debtors, a bankruptcy discharge is obtained upon

6

confirmation of a plan unless the plan does not provide for continued operations. See discussion

7

at note 32, supra.

8

In In re Rent-Rite Super Kegs W. Ltd., 484 B.R. 799 (Bankr. D. Colo. 2012), creditors

9

sought to dismiss a voluntary Chapter 11 case filed by the owner of a warehouse. Dismissal was

10

sought because twenty-five percent of the non-individual debtor's revenues came from

11

warehouse tenants engaged in the medical marijuana industry. Although the tenants' operations

12

were authorized under Colorado law, the bankruptcy court found that the revenue source violated

13

the Controlled Substances Act and subjected the secured creditor's real property collateral to

14

potential criminal forfeiture proceedings under federal law. Id. at 805-06. The court, therefore,

15

found that "cause" existed under Section 1112(b) due to gross mismanagement and application

16

of the unclean hands doctrine. Id. at 809. Because the remaining seventy-five percent of the

17

debtor's revenues were not derived from the marijuana tenants, however, the court scheduled a

18

further hearing to determine whether conversion or dismissal would be in the best interests of

19

creditors. Id. at 810-11.[38]

20

In In re Arm Ventures, LLC, 564 B.R. 77 (Bankr. S.D. Fla. 2017), the Chapter 11 debtor,

21

which did not have any income derived from marijuana-related sources as of the petition date,

22

proposed a plan that contemplated leasing real property to an affiliate that would generate

23

income from medical marijuana as permitted by Florida law. The secured creditor sought

24

dismissal based on a variety of factors, including the debtor's reliance on marijuana-related

25

sources of income to fund its plan. The court agreed that it could not confirm such a plan, but it

26

27

28

---

[38] According to the docket in the Rent-Rite case, approximately two years later (April 17, 2014), the bankruptcy court entered an order dismissing the Chapter 11 proceeding pursuant to a stipulation between the U.S. Trustee and the debtor in possession. (Rent-Rite ECF No. 175).

provided the secured creditor with relief from the automatic stay in lieu of dismissal.  Id. at 86-87.  The court also gave the debtor two weeks to file an amended plan that did not rely on marijuana-related sources of income, absent which the court would convert the case to Chapter 7 and the secured creditor would be authorized to immediately proceed with its foreclosure sale. Id. at 86 & n.23.[39]

In In re Way to Grow, Inc., 597 B.R. 111 (Bankr. D. Colo. 2018), the Chapter 11 debtors' business

> involve[d] the sale of equipment for indoor hydroponic and gardening-related supplies.  As to their customers' uses of their products, Debtors have represented "[w]hile the hydroponic gardening equipment may and is used for many types of crops, the Debtors' future business expansion plan is tied to the growing cannabis industry which is heavily reliant on hydroponic gardening."

Id. at 115.  After discussing various bankruptcy decisions involving debtors engaged in illegal activities, including the decision in Rent-Rite, the court discussed "three basic propositions" gleaned from this caselaw:

> First, a party cannot seek equitable bankruptcy relief from a federal court while in continuing violation of federal law.  Second, a bankruptcy case cannot proceed where the court, the trustee or the debtor-in-possession will necessarily be required to possess and administer assets which are either illegal under the CSA or constitute proceeds of activity criminalized by the CSA.  And third, the focus of this inquiry should be on debtor's marijuana-related activities during the bankruptcy case, not necessarily before the bankruptcy case is filed.

Id. at 120.  Utilizing these principles, the court found "cause" existed to dismiss the case under Section 1112(b) because the debtors' business violated the Controlled Substances Act. Specifically, after conducting a four-day evidentiary hearing, the court did not find credible the debtors' explanation that it would try to distance itself from selling its products to entities engaged in marijuana-related activities.  The court further found that the reduction of debtors'

---

[39] According to the docket in the Arm Ventures case, the debtor filed a proposed amended plan of reorganization (Arm Ventures ECF No. 149), but the plan was never confirmed. Instead, the Chapter 11 proceeding was later dismissed.  (Arm Ventures ECF No. 261).

revenue from marijuana-related sources would devastate the debtor's income stream, thereby making confirmation difficult, if not impossible. Finally, even if the court required the debtors to extricate themselves from the marijuana industry, the court concluded that the cost and effort of ensuring compliance would be inefficient, costly, and difficult to monitor:

> In any event, the Court does not believe such an order [requiring the debtor to extricate itself from marijuana-related sources of business], or the remediation it would require, would be effective in this case. The Court cannot simply order Debtors to cease all sales to customers known to be involved in marijuana cultivation, because the usefulness of Debtors' products in illegal grow operations will continue to attract marijuana horticulturalists to Debtors' business, including those growing marijuana solely for personal use. Debtors have already acquired a venerable reputation for expertise in hydroponic marijuana growing, and it is difficult to imagine how Debtors could prevent customers from continuing to patronize Debtors' stores because of this reputation. Indeed, the evidence does not show Debtors' essential business model has changed post-petition, which, of course, is the relevant time to determine whether Debtors may remain in bankruptcy. In any event, any such order would require the Court, and interested parties, to monitor the Debtors' sales and customers, which would be very difficult and inefficient. Further, in light of the acrimonious nature of [the relationship between the party-in-interest moving for dismissal] with the Debtors, the Court can be reasonably certain such an order would lead to costly and time-consuming future litigation over the Debtors' compliance.

> To prevent this Court from violating its oath to uphold federal law, under the specific facts of this case, the Court sees no practical alternative to dismissal.

Id. at 132.[40]

The common theme of these voluntary Chapter 11 cases is the bankruptcy court's consideration of whether the debtor in possession could propose a feasible plan that did not rely on income received through a violation of the Controlled Substances Act.

(3) **Chapter 7 Cases**.

---

[40] The debtors subsequently appealed the bankruptcy court's order, although the district court denied their request for a stay pending appeal. See Way to Grow, Inc. v. Inniss (In re Way to Grow, Inc.), 2019 WL 669795 (D. Colo. Jan. 18, 2019).

Relief under Chapter 7 is available to both individuals and non-individuals, and may be initiated both voluntarily and involuntarily. For individual Chapter 7 debtors, the property of the bankruptcy estate is administered by a bankruptcy trustee, see 11 U.S.C. § 704(a), and a bankruptcy discharge is obtained if no timely objections are filed by parties in interest. See 11 U.S.C. § 727(b). For non-individual Chapter 7 debtors, the property of the bankruptcy estate is administered by a bankruptcy trustee, but a discharge is not available. See 11 U.S.C. § 727(a)(1).

In Arenas v. U.S. Trustee (In re Arenas), 535 B.R. 845 (B.A.P. 10th Cir. 2015), the U.S. Trustee moved to dismiss a voluntary Chapter 7 case in which the individual debtors sold marijuana and obtained rental income from an entity engaged in the marijuana industry that was lawful under Colorado law. In response, the debtors sought to convert the case to Chapter 13. The bankruptcy court denied conversion and dismissed the case. The bankruptcy appellate panel for the Tenth Circuit affirmed and expressed their agreement "with the bankruptcy court that while debtors have not engaged in intrinsically evil conduct, the debtors cannot obtain bankruptcy relief because their marijuana business activities are federal crimes." Id. at 849-50. The appellate panel concluded that the debtors likely would be unable to satisfy the "good faith" requirement under Section 1325(a)(3) to confirm a Chapter 13 plan, and neither a Chapter 7 or 13 trustee could administer assets without violating federal law. Id. at 852.[41] It further observed that allowing the debtors to remain in Chapter 7 would prejudicially delay creditors, who would likely receive no distribution on their claims, while the debtors would receive a discharge and would be allowed to continue business operations that were illegal under the Controlled Substances Act. Id. at 853-54.

In In re Medpoint Mgmt., LLC, 528 B.R. 178 (Bankr. D. Ariz. 2015), vacated in part on other grounds, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016), an involuntary Chapter 7 case

---

[41] There is disagreement on whether a bankruptcy trustee who merely requests the disposal of marijuana-related assets is acting in violation of the Controlled Substances Act. See Steven J. Boyajian, "*Just Say No to Drugs? Creditors Not Getting a Fair Shake When Marijuana-Related Cases are Dismissed,*" XXXVI ABI Journal 9, 24-25, 74-75, September 2017.

was filed against a non-individual entity that provided management services to medical marijuana businesses licensed under Arizona law.  The alleged debtor stated "that all of its assets are marijuana-related," and counsel for the U.S. Trustee also expressed her belief that the alleged debtor did not have "any legal, non-marijuana assets that a trustee could lawfully administer." 528 B.R. at 184.  The court dismissed the case because its continuation would require a Chapter 7 bankruptcy trustee to violate federal law and subject the bankruptcy estate to possible forfeiture of the alleged debtor's assets.  Id. at 186.[42]  The court also found that the petitioning creditors, who voluntarily conducted business with an entity engaged in illegal activities, were barred from seeking relief under the "unclean hands" doctrine.  Id. at 186-87.[43]

---

[42] Apparently, the authority of a bankruptcy trustee to waive the attorney-client privilege between a corporate debtor and its legal counsel was not raised.  See Commodity Futures Trading Comm. v. Weintraub, 471 U.S. 343, 354, 105 S.Ct. 1986, 1994 (1985).  When the activity of the corporate client is admittedly in violation of federal law, the criminal penalties for which extend to multiple parties and for many years, see discussion at note 14, supra, the potential legal consequences of a waiver may be extraordinary.

[43] In Misle, see note 24, supra, an involuntary Chapter 7 case was filed against an individual.  The alleged debtor sought dismissal of the case based on his representation that his entire income is derived from marijuana sources authorized under Nevada law, but which are in violation of the Controlled Substances Act.  See Order Denying Motion for Dismissal on Involuntary Case, entered January 2, 2019 ("Misle Order"), at 2-3. (Misle ECF No. 57).  The alleged debtor conceded, however, that (1) he had a 50% interest in a non-marijuana related entity, though he claimed that his ex-wife had exclusive control over that entity, (2) a Chapter 7 trustee could not legally take control of that entity, and (3) his ex-wife would likely not make any distributions to him.  See Misle Order at 2-3 & n.5 and 5 n.11.  The alleged debtor further relied on a letter and memo prepared by the Executive Office of the United States Trustee in arguing that trustees should not be put in the position to administer assets that would subject them to potential violations of federal law.  Although the bankruptcy court agreed with this premise, the court found it premature to speculate as to the position of the U.S. Trustee, who had not yet entered an appearance.  Id. at 4-5.  The court further raised the possibility that a trustee might not be violating federal law if the marijuana-related assets were not property of the estate based on a non-marijuana-related, government forfeiture case entitled U.S. v. French, 822 F.Supp.2d 615 (E.D. Va. 2011).  Id. at 4.  Finally, the court opined that it did not have sufficient evidence from the alleged debtor that he did not have viable non-marijuana related assets that could be used to pay his creditors.  For these reasons, the court declined to adopt a per se rule, as the alleged debtor urged, to dismiss the involuntary case based solely on the existence of marijuana-related business operations.  Id. at 5-6.  The individual alleged debtor appealed the order denying dismissal of the involuntary case, and the bankruptcy court stayed the involuntary case pending the outcome of the appeal.  (Misle ECF No. 104).

In <u>Northbay Wellness Group, Inc. v. Beyries</u>, 789 F.3d 956 (9th Cir. 2015), an attorney stole money from his client, i.e., a medical marijuana dispensary, and subsequently filed a personal, voluntary Chapter 7 bankruptcy.  The dispensary instituted an adversary proceeding seeking to except its claim from discharge, but the bankruptcy court dismissed the adversary complaint under the "unclean hands" doctrine.  The Ninth Circuit reversed and remanded, explaining that the bankruptcy court failed to balance the parties' respective wrongdoings as required under that doctrine:

> The Supreme Court has emphasized, however, that the doctrine of unclean hands "does not mean that courts must always permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law." [*Johnson v.] Yellow Cab [Transit Co.*], 321 U.S. [383, 387 (1944)].  Rather, determining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and "weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right."  *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 350 (9th Cir. 1963).  In addition, the "clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest."  *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 753 (9th Cir. 1991).

<u>Id.</u> at 960.  The Ninth Circuit additionally observed "that the doctrine of unclean hands cannot prevent recovery of funds stolen from a client by his or her lawyer."  <u>Id</u> at 961.[44]

The common theme in all of these Chapter 7 cases is that the mere involvement of marijuana-related assets, income, or connections to the debtor, is not dispositive of whether a particular case is permitted to proceed.[45]

---

[44] Proper application of the unclean hands doctrine is designed to preserve public confidence in, as well as the integrity of the court, by preventing it from becoming a participant in inequitable conduct.  <u>See</u> <u>Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.</u>, 324 U.S. 806, 814-15, 65 S.Ct. 993, 997-98 (1945); <u>In re Leeds</u>, 589 B.R. 186, 200 (Bankr. D. Nev. 2018).

[45] In <u>Misle</u>, the bankruptcy court raised the prospect under <u>U.S. v. French</u> that a debtor's interest in property may not become property of a bankruptcy estate if the property was acquired through an illegal act that would be subject to forfeiture under federal law.  In <u>French</u>, creditors filed an involuntary Chapter 7 petition against an individual, and an order for relief was

### (4) **Non-Bankruptcy Cases.**

Two of the other cases cited by the parties address the likelihood of prosecution under the Controlled Substances Act, rather than whether particular conduct is in fact illegal under federal law. The remaining case addresses the appointment of a receiver under Colorado law, but does

---

subsequently entered. Months prior to the bankruptcy filing, however, the debtor had pled guilty to wire fraud and money laundering, and the government obtained orders of forfeiture of the debtor's personal property assets that were involved and/or obtained through the commission of those crimes. The Chapter 7 trustee asserted an interest in the forfeited property as a bona fide purchaser under Section 544(a). In entering summary judgment against the trustee, the court recognized that the "relation back" doctrine under 21 U.S.C. § 853(c) "vests all forfeited property in the United States <u>upon the commission of the act</u> giving rise to forfeiture." 822 F.Supp.2d at 619. (Emphasis added). Therefore,

> by operation of the "relation back" doctrine, [the debtor's] forfeited property vested in the United States at the time of his criminal acts, *i.e.* in 2005—six years prior to the creation of the bankruptcy estate. Upon her appointment, the [Chapter 7] Trustee merely stands in the shoes of the debtor as a bona fide purchaser. Because [the debtor] lacked an ownership interest in the forfeited property at the creation of his bankruptcy estate, the Trustee also lacks an ownership interest and thus, lacks standing to challenge the forfeiture order.

<u>Id</u>. at 619. Although it did not rule on the issue, the district court in <u>French</u> acknowledged other caselaw holding that a similar result applies <u>even when the forfeiture order is entered after the creation of the bankruptcy estate.</u> <u>Id</u>. at n.3, <u>citing, e.g.</u>, <u>U.S. v. Zaccagnino</u>, 2006 WL 1005042 (C.D. Ill. Apr. 18, 2006).

A more persuasive authority than <u>French</u>, however, is the decision by the bankruptcy appellate panel for the Ninth Circuit in <u>U.S. v. Klein (In re Chapman)</u>, 264 B.R. 565 (B.A.P. 9th Cir. 2001). In <u>Chapman</u>, the appellate court concluded that a civil forfeiture action for assets used in the manufacture and distribution of marijuana is excepted from the automatic stay under Section 362(b)(4) as an exercise of the police and regulatory power of the federal government. <u>Id</u>. at 570-71. The court acknowledged that a civil forfeiture judgment may have the effect of retroactively eliminating property from the Chapter 7 bankruptcy estate because of the relation-back doctrine. <u>Id</u>. at 572. The appellate court concluded, however, that the federal government could complete its forfeiture action "<u>even if the end result is that the Proceeds [from the sale of the assets] are not property of the estate.</u>" <u>Id</u>. (Emphasis added). The resulting uncertainty is that a bankruptcy case might be filed for a marijuana-related entity, but the assets held at the time of the bankruptcy petition might be forfeited in favor of the federal government retroactive to the date of the debtor's violation of the Controlled Substances Act. <u>See generally</u> Craig Peyton Gaumer, *When Two Worlds Collide: The Relationship and Conflicts between Asset Forfeiture and Bankruptcy Law*, 21-May Am.Bankr.Inst.J. 10 (May 2002).

not address the Controlled Substances Act at all. As previously discussed, there is no meaningful dispute that the Marijuana Business operated by the Debtor is not permitted by federal law.

In <u>U.S. v. McIntosh</u>, 833 F.3d 1163 (9th Cir. 2016), several defendants from California and Washington, which authorized the cultivation of medical marijuana, sought to enjoin their convictions for various marijuana-related violations of the Controlled Substances Act. They argued that Congress approved a rider to successive appropriations bills (referred to as "§ 542")[46] that prohibited the Justice Department from spending any of its funds "to prevent States [who have legalized medical marijuana] from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana." <u>Id.</u> at 1169-70. In examining its jurisdiction and appellants' standing, the Ninth Circuit found, among other things, that "[e]ven if Appellants cannot obtain injunctions of their prosecutions themselves, they can seek— and have sought—to enjoin [the Justice Department] from *spending funds* from the relevant appropriations acts on such prosecutions." <u>Id.</u> at 1172 (emphasis in original). Thereafter, the court held that § 542 only prohibits the Justice Department from utilizing funds to prosecute individuals who are in <u>full</u> compliance with applicable state medical marijuana laws:

> Individuals who do not strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana have engaged in conduct that is unauthorized, and prosecuting such individuals does not violate § 542. Congress could easily have drafted § 542 to prohibit interference with laws that address medical marijuana, but it did not. Instead, it chose to proscribe preventing states from implementing laws that authorize the use, distribution, possession, and cultivation of medical marijuana.

<u>Id.</u> at 1178. The Ninth Circuit therefore vacated and remanded appellants' cases with instructions for the district courts to conduct evidentiary hearings to determine whether or not

---

[46] Debtor refers to § 542 as the "Rohrbacher-Farr Amendment," <u>see</u> Opposition at 6:5 to 7:8, in arguing that the Justice Department may not expend funds to prosecute marijuana offences under the Controlled Substances Act. Although the Congressional appropriations process was once predictable, including the attachment of riders to spending bills, that may no longer be true.

appellants' operations fully complied with their respective state's medical marijuana laws.  Id. at 1179.

In U.S. v. Kleinman, 880 F.3d 1020 (9th Cir. 2017), an individual appealed his conviction of various marijuana-related offenses based, in part, on the Justice Department's prohibited use of funds under § 542.  In affirming his conviction, the Ninth Circuit first found that appellant's conviction, which was entered prior to the passage of § 542, would not be vacated because § 542 did not change the illegality of marijuana-related offenses under federal law:

> § 542 does not require a court to vacate convictions that were obtained before the rider took effect.  In other words, when a defendant's conviction was entered before § 542 became law, a determination that the charged conduct was wholly compliant with state law would *not* vacate that conviction.  It would only mean that the [Justice Department's] continued expenditure of funds pertaining to that particular state-law-compliant conviction *after* § 542 took effect was unlawful.  That is because, as we explained in *McIntosh*, § 542 did not change any substantive law; it merely placed a temporary hold on the expenditure of money for a certain purpose.

Id. at 1028 (emphasis in original).

In Yates v. Hartman, 2018 WL 1247615 (Colo. App. Mar. 8, 2018), a spouse sought the appointment of a receiver over medical and recreational marijuana entities held in a marital dissolution proceeding.  The entities were authorized to operate under Colorado law, and none of the parties asserted that their operations otherwise were illegal under the Controlled Substances Act.  The appellate court concluded that any receiver must possess the proper licenses under Colorado law to operate the entities.  Id. at *3-4.  It therefore reversed the trial court's appointment of a receiver.  Id. at *4.

The relevant theme of these non-bankruptcy cases[47] is that while Congress may act to

---

[47] The Yates v. Hartman decision raises a potential issue in any judicial proceeding that involves a party engaged in state-licensed activity: can a state court-appointed receiver, or an assigned bankruptcy trustee, continue to conduct operations of the subject entity without express approval of the licensing authority?  In Nevada's long-established gaming industry, a temporary gaming license may be sought from the Nevada Gaming Commission by a state-court receiver or bankruptcy trustee for continued operation of a casino or other gaming establishment.  See Nev. Gaming Reg. 9.030.  The court is not aware of whether similar authority exists for Nevada's

deny funding for federal prosecution of marijuana offenses under the Controlled Substances Act, it has not acted to legalize the cultivation, production and distribution of marijuana.[48]  Until it does so, all parties engaged in or having a significant connection with the marijuana industry face a creeping absurdity[49]:  they can rely in good faith on more and more state laws to increasingly form new businesses, increasingly invest and loan millions of dollars,[50] and

_____

fledgling marijuana industry and the State of Nevada has not provided such information in this Chapter 11 proceeding.

[48] Congress' efforts to criminalize the cultivation, production and distribution of marijuana, even if such activity occurs solely within the borders of a particular state, does not rule afoul of the U.S. Constitution.  See Gonzales v. Raich, 545 U.S. 1, 22, 125 S.Ct. 2195, 2208-09 (2005).  Under 21 U.S.C. § 811(h)(2), Congress appears to have delegated its authority over the substances included on the Schedules to the Controlled Substances Act to whomever currently serves as the Attorney General of the United States.  See Touby v. United States, 500 U.S. 160, 165, 111 S.Ct. 1752, 1756 (1991); Washington v. Sessions, 2018 WL 1114758, at *3 (S.D.N.Y. Feb. 26, 2018).  Unfortunately, recent occupants of the position have taken widely divergent views on the enforcement of the federal laws, including the Controlled Substances Act, pertaining to marijuana.  See generally NLJ Survey, supra, at 115-120.  See, e.g., Memorandum to All United States Attorneys, [former] Attorney General Jefferson B. Sessions, January 4, 2018, attached as Exhibit "E" to 4Front Reply ("Given the Department's well-established general principles, previous nationwide guidance specific to marijuana enforcement is unnecessary and is rescinded, effective immediately.")(Emphasis added); Sacramento Nonprofit Collective v. Holder, 552 Fed.Appx. 680, 683 (9th Cir. Jan. 15, 2014) ("Appellants claim that the Government is judicially estopped from enforcing the CSA because in a prior lawsuit involving different plaintiffs, the parties entered into a joint stipulation to dismiss the sole remaining claim in that case – that the Tenth Amendment barred federal enforcement of the CSA with respect to medical marijuana use under California law – in light of the Ogden Memorandum.  But the Appellants over-read the statements made in both the Ogden Memorandum and during the course of the prior litigation; at no point did the Government promise not to enforce the CSA. Appellants therefore identify no clear inconsistency between the Government's current and prior positions as is required to invoke the doctrine of judicial estoppel.")(Emphasis added).

[49] See U.S. v. Lozoya, 920 F.3d 1231, 1242 (9th Cir. 2019) (acknowledging a "creeping absurdity" of the appellate court's holding as to proper venue for prosecution of federal crimes occurring on transcontinental air flights, i.e., in the federal judicial district over which the aircraft was flying when the alleged federal criminal act occurred).

[50] Commercial actors who deal with marijuana-related businesses authorized under state law apparently acknowledge the risk that they may be parties to a violation of the Controlled Substances Act.  See, e.g., January 9, 2018, $3,000,000 Line of Credit Facility, between MI-CW Holdings NV Fund 2 LLC and CWNevada, LLC, at Representations and Warranties, Paragraph 6(d) ("Borrower (i) has all necessary permits, approvals, authorizations, consents, licenses,

increasingly enter into occupations that expose all of them to possible federal criminal prosecution.[51]  Moreover, state and local governments that derive tax revenues from medical and recreational marijuana businesses face continuous uncertainty.[52]

---

franchises, registrations and other rights and privileges…to allow it to own and operate its business with any violation of law (excluding the federal Controlled Substances Act and related regulations) or the rights of others; (ii) is duly authorized, qualified and licensed under and in compliance with all applicable laws, regulations, authorizations and orders of public authorities (other than the federal Controlled Substances Act and related regulations);…").  (Emphasis added).  (Ex. "5" to Kanitz Declaration).

[51] In the Misle involuntary Chapter 7 case, the bankruptcy court expressed a version of this absurdity as follows:  "As previously noted, recreational marijuana is legal in Nevada, and trustees in this district have presumably administered cases in which individual debtors possessed and/or used marijuana during the bankruptcy case.  In such circumstances, is the court required to dismiss every individual bankruptcy case upon the debtor's admission that he or she possesses and/or uses marijuana for personal use?  That is the natural progression of the Alleged Debtor's proposed per se rule and would only serve to invite abuse by opportunistic debtors who could simply use this mandatory 'get out of bankruptcy' card at any time they see fit."  Misle Order at 3 n.6.  While Misle was an involuntary proceeding filed against an individual, it illustrates the prospect of more voluntary bankruptcy petitions being filed under any chapter by individuals and non-individuals solely for the purpose of triggering the automatic stay under Section 362(a).  See discussion at 8-9, supra.  If the disclosure of marijuana-related assets or activities requires a bankruptcy court to dismiss a case after a petition is filed, the debtor may have obtained temporary protection from creditors without any intention of obtaining a bankruptcy discharge of debts.  While Congress has provided a partial solution for individuals who repeatedly file consumer bankruptcy petitions, see 11 U.S.C. §§ 362(c)(3) and (c)(4), it has provided no meaningful solution for non-individual debtors that repeatedly file Chapter 11 petitions.

[52] See NLJ Survey, supra, at 118 ("Since Nevada legalized recreational marijuana, there have been an estimated $126 million in sales and $19 million in marijuana excise and wholesale taxes independent of sales tax and state and local licensing fees for marijuana dispensaries.  With nearly 300 licensed businesses, the Nevada Dispensary Association estimates that the marijuana industry employs 8,700 people and invested $280 million in real estate.  Further, the state awaits the funds from the 15 percent excise tax on marijuana sales, approximately $40 million, that it has earmarked for public education over the next biennium.  Nevada, like other states, awaits the recreational marijuana industry's harvest.").  Compare Candace Carlyon, "*We Don't Serve Your Kind Here: Federal Courts and Banks Don't Dance with Mary Jane,*" 26 Nevada Lawyer, Issue 2, at 9 (February 2018) [hereafter "Nevada Lawyer"] ("The result of the conflict between state and federal law creates a dangerous situation in which businesses are booming but unable to deposit receipts without disguising the source of their funds.  The case nature of the business, without any ability to deposit receipts, places the businesses, their employees and their customers in a dangerous situation.  The ripple effect created by these successful businesses is huge.  The

### 3.  The Evidence Presented by the Parties.

The burden of proof on this Dismissal Motion rests with 4Front as the party seeking

relief.  See, e.g., In re Rosenblum, 2019 Bankr. LEXIS 1160 (Bankr. D. Nev. Mar. 15, 2019)

(order denying former spouse's alternative requests for dismissal, abstention, appointment of

trustee, or relief from stay).  The evidentiary record before the court consists of the written

testimony offered by declarants Krane, Braddock, Malley, Miltenberger, Kanitz, and Padgett, the

exhibits offered by the declarants, and the documents for which judicial notice has been

requested.  No objections have been raised as to any of the written testimony offered, the exhibits

accompanying the declarations, or to the matters for which judicial notice was requested.

Likewise, various documents have been attached as "exhibits" to the written legal arguments,

some of which are not authenticated, but no objections have been raised to the inclusion of those

documents as part of the record.

Among other things, Krane attests that 4Front entered into a consulting agreement with

the Debtor in March 2014, for which it has not been paid under an arbitration award.  See Krane

Declaration at ¶¶ 6, 10, 11 and 12.  As counsel for 4Front, Braddock attests, *inter alia*, that in

May 2017, 4Front sued the Debtor in State Court to collect payments under the consulting

agreement.  See Braddock Declaration at ¶ 3.  He also attests that prior to the Debtor's

commencement of this Chapter 11 proceeding, 4Front took numerous steps to confirm and

enforce an arbitration award in its favor, including prosecution of its Receivership Application

and a request to hold the Debtor in contempt.  Id. at ¶¶ 6 and 14.  Braddock further attests that

the State Court entered a judgment confirming the arbitration award, and the Debtor still refused

to pay.  Id. at ¶ 16.

As counsel for Highland Partners, and on behalf of both Highland Partners and Green

Pastures, Malley attests that in July 2018, these parties commenced additional State Court

actions against the Debtor for breach of a lease as well as certain loan agreements.  See Malley

Declaration at ¶ 5.  He also attests that numerous other legal actions have been commenced in

---

receipts from marijuana-related businesses are paid over to vendors, landlords, employees and
governmental agencies: all of these need to deposit those payments.").

State Court by other parties.  Id. at ¶ 8.  As counsel for Green Pastures, Miltenberger attests that in May 2015, Green Pastures entered into an agreement with the Debtor to purchase certain promissory notes but that the Debtor has been in default since no later than June 2018.  See Miltenberger Declaration at ¶¶ 5, 6 and 7.  As the manager of an asset management firm, Kanitz attests that in May 2017, Highland Partners entered into a commercial lease with the Debtor for premises located at 3132 Highland Drive and 3152 Highland Drive, in Las Vegas.  See Kanitz Declaration at ¶ 4.  He also attests that between June and November 2016, certain members of Highland Partners entered into agreements with the Debtor to purchase certain promissory notes, and also to loan additional funds to the Debtor, all of which agreements have been breached.  Id. at ¶ 5.  Kanitz also attests that in September 2017 and January 2018, other members of Highland Partners entered into other transactions with the Debtor, including a secured line of credit, all of which have been breached.  Id. at ¶ 6.

As the manager of BCP Holding, which is the manager of the Debtor, Padgett attests, inter alia, that on March 14, 2019, a judgment was entered by the State Court confirming an arbitration award in favor of 4Front in the amount of $4,987,092.29.  See Padgett Declaration at ¶ 7.  He also attests that the Debtor has workers compensation and liability insurance coverage in place through April 26, 2020.  Id. at ¶ 10.  Padgett also attests that the Debtor has employee health insurance as well as automobile insurance in place as of April 8, 2019.  Id. at ¶¶ 11 and 12.  He attests that the Debtor made a payment of $81,850 to the Nevada Department of Taxation on April 23, 2019.  Id. at ¶ 13.  Padgett attests that an eviction proceeding has been commenced by "Renaissance one landlord" with respect to a commercial lease "which is critical to CWNevada's operations."  Id. at ¶ 15.  He also attests that the "Debtor is in the process of establishing banking relationships at the very same banks that 4Front has established its relationships with."  Id. at ¶ 20.

In addition to the exhibits previously mentioned in this order, see discussion at 5-6, supra, the record encompasses copies of various documents submitted by 4Front, including: the Declaration of Anthony Imbimbo in Support of CWNevada's Opposition to Motion to Affirm Arbitration Award ("Imbimbo Declaration") filed in State Court on or about February 14, 2019,

in Case No. A-17-755479-C (Ex. "4"); the final arbitration award in favor of 4Front in the amount of $3,741,803.92 (Ex. "8"); the State Court order and final judgment confirming the arbitration award (Ex. "9"); a preliminary injunction entered by the State Court on March 14, 2019, enjoining the Debtor from "selling, transferring, or otherwise disposing of any assets in their possession, custody, and/or control, including any Nevada cannabis license and cash received (except as needed for normal business operations) from the lawful sale of cannabis through their Nevada retail dispensaries until this court orders otherwise" (Ex. "11"); a State Court complaint entitled <u>Maria Navarrete, et al. v. CWNevada, LLC, et al.</u>, Case No. A-19-792575-C, filed April 4, 2019, alleging, *inter alia*, that the Debtor was in default in payment of employees at three Nevada marijuana dispensaries operating under the name "Canopi" (Ex. "13"); email correspondence dated April 10, 2019, from a revenue officer at the Nevada Department of Taxation indicating that a balance of $388,890.45 was then-owing by the Debtor, along with various periodic statements of taxes due (Ex. "14"); an ex parte application for order to show cause why the Debtor should not be held in contempt, filed by 4Front in State Court on April 12, 2019 (Ex. "15"); an email dated April 13, 2019, from Padgett to Van Oyen and Kanitz ("Padgett Email") (Ex. 16); the U.S. Trustee's Guidelines for Region 17 as of December 16, 2016 ("UST Guidelines") (Ex. "A"); and the UST List of Authorized Depositories, District of Nevada, Fourth Quarter CY 2018 ("Approved Depository List") (Ex. "B").

Copies of various documents also were submitted by Highland Partners and Green Pastures, including: the Declaration of Brian Padgett dated September 5, 2018, filed in State Court in Case No. A-18-777270-B ("2018 Padgett Declaration") (Ex. "1" to Malley Declaration); the Convertible Note Purchase Agreement dated May 20, 2015, between various purchasers (including Green Pastures) and the Debtor (Ex. "1" to Miltenberger Declaration); a Commercial Lease dated May 24, 2017, for the Debtor's lease of premises from Highland Partners for an industrial building located at 3132 Highland Drive and 3135 Highland Drive in Las Vegas (Ex. "1" to Kanitz Declaration); a Series B Preferred Convertible Note Purchase Agreement dated November 7, 2016, between the Debtor and Appleseed Ventures Growth Opportunity Fund LLC, that includes, as Schedule 7(f), the CWNevada, LLC, Financial

Statements for the Year Ended December 31, 2015 ("2015 Financial Statement") (Ex. "2" to Kanitz Declaration); and, a Promissory Note dated June 9, 2017, memorializing a loan to the Debtor in the amount of $161,802.81, obtained from Appleseed Ventures Growth Opportunity Fund LLC (Ex. "3" to Kanitz Declaration).

CIMA Group also submitted a number of documents, including the following: CIMA Group's emergency ex parte application for appointment of receiver and notice of suspension of registration, filed on April 13, 2019, in State Court in Case No. A-17-755479-C ("CIMA Group Application") (Ex. "1" to CIMA Joinder); the Notice of Verified Third-Party Claim and Demand for Surety, filed on February 15, 2019 on behalf of Brian Padgett, in State Court in Case No. A-18-773230-B ("Padgett Claim") (Ex. "2" to CIMA Joinder); and the Affidavit of Timothy Smits Van Oyen, a member of the Debtor[53], filed on May 13, 2019, in State Court in Case No. A-17-755479-C ("Van Oyen Affidavit") (Ex. "1" to CIMA Reply).

### 4.  Dismissal Based on Abstention is Warranted under Section 305(a).

The production and distribution of CBD products is not prohibited by the Controlled Substances Act if the THC concentrations in the particular hemp plant conform to the limitations prescribed under Title 7.  See discussion at 7, supra.  No one challenges Padgett's written testimony that a portion of the Debtor's operations includes a CBD Business.  According to the Debtor's independent accountant, however, as of February 14, 2019, the Debtor's

> Current inventory on hand includes over [redacted] pounds of Cannabis Flower broken down into various sales weights (valued at $[redacted]), Cannabis Trim of [redacted] ) valued at $[redacted]) pound for a total of $[redacted], Edible Products of [redacted] units (valued at $[redacted]), Concentrates of [redacted] units (valued at $[redacted]), and Work in Process inventory (valued at $[redacted]).  The fair market value of this inventory totals $[redacted].

See Imbimbo Declaration at ¶ 7.  Inasmuch as the recent inventory provided by its independent accountant may or may not include any CBD products, it is difficult to determine the

---

[53] As of December 31, 2015, Van Oyen had a twenty percent (20%) ownership interest in the Debtor while Padgett had a sixty percent (60%) ownership interest.  See Statement of Equity set forth in 2015 Financial Statement.

significance of the Debtor's CBD Business.  Moreover, there is no evidence of whether any portion of the Debtor's CBD Business includes the type of CBD products that are excluded from the Controlled Substances Act.[54]

Upon the commencement of a Chapter 11 proceeding, a debtor in possession ordinarily is required to close its existing bank accounts "and establish new debtor in possession accounts to be used for all transactions during the pendency of the case."  UST Guidelines at 4.4.6(b).  The new accounts must be established at a depository institution meeting the requirements of Section 345(b).  Those requirements are designed to ensure the safety of the funds held by a trustee or debtor in possession as a fiduciary of a bankruptcy estate.  A list of approved depositories is maintained by the U.S. Trustee.  See UST Guidelines at 4.4.6(a)(1).  Padgett attests that the Debtor is attempting to establish debtor in possession accounts with the "very same banks that 4Front has established its relationships with."  Padgett Declaration at ¶ 20.  While 4Front has offered no evidence to the contrary, the Debtor's factual and legal position is a false equivalency: 4Front is not a debtor in possession and is not subject to the same requirement.  The names of thirty-nine approved financial institutions, including Bank of Nevada, Bank of George, First Security Bank of Nevada, and Heritage Bank of Nevada, have been provided to the voluntary Chapter 11 debtor in possession.  See Approved Depository List at 1.  Because Debtor has never filed any Schedules nor a SOFA that would disclose any bank accounts that existed when it filed its voluntary Chapter 11 Petition, or which were closed prior to filing the Petition, the court does

---

[54] A marijuana-related business that cultivates, produces and distributes products that are both illegal and legal, with some proceeds subject to forfeiture and other proceeds not, may create the type of  "tracing" concern commonly associated with Ponzi schemes.  See Cunningham v. Brown, 265 U.S. 1, 11-13, 44 S.Ct. 424, 426-27 (1924).  Compare U.S. v. Gettel, 2017 WL 3966635 (S.D. Cal. Sep. 7, 2017)(resolution of competing claims to proceeds of real property that are the subject of government forfeiture).  If the proceeds of a marijuana-related business are commingled, what test will be applied to determine which proceeds were subsequently used to acquire additional assets?  Which of the subsequently acquired assets are subject to forfeiture and which of them are not?  Which assets might be excluded from the bankruptcy estate, and which might not?

not know whether the Debtor even had any bank accounts to close.[55]  At the very least, however, Debtor should be able to identify an approved depository institution in which it has attempted to open its required debtor in possession accounts.[56]  It has not done so.

As a non-individual, fictitious legal entity, Debtor cannot proceed without legal counsel. See generally United States v. High Country Broadcasting Co. Inc., 3 F.3d 1244, 1245 (9th Cir. 1993).  The voluntary Chapter 11 petition was signed by the Debtor's general counsel, and such counsel conceded at the hearing on the Dismissal Motion that the Debtor must obtain separate, disinterested, bankruptcy counsel.  The record also reveals that Padgett holds the majority of the membership interests of the Debtor, see note 53, supra, and also is the manager of BCP Holding, which is the manager of the Debtor.  The record further discloses that Padgett previously provided some nature of legal services to the Debtor.  See 2015 Financial Statement at Note 3: Related Party Transactions.[57]  The record also reveals that the Debtor's general counsel also represents Padgett personally and filed the Padgett Claim in one of the actions pending in State Court.[58]  In that claim, Padgett represents that he "is the owner of all rights, title and interest" to

---

[55] The difficulties that a marijuana business authorized under state law has in establishing bank accounts is often discussed.  See Nevada Lawyer, supra, at 8-9.  In this instance, it appears that the Debtor made a portion of its April 23, 2019 tax payment to NDOT using a check.  See discussion at note 12, supra.  Assuming the item referenced was a typical check from a checking account, rather than a check associated with a credit line, there should be information available as to the banking institution where the Debtor does business.  That information does not appear in the record.

[56] In its opposition to the Dismissal Motion, Debtor quotes from "Page 199" of the Cannex Notice referring to "banking relationships with 1st Bank of Colorado, Century Bank of Massachusetts, and Bank of Springfield in Illinois."  See Opposition at 9:7-10.  Unfortunately, there appears to be no part of the Cannex Notice that includes a page 199.  More important, even if 4Front has relationships with those financial institutions, none of them appear on the Approved Depository List.

[57] During 2015, Debtor paid $117,625.00 in legal and professional fees.  See 2015 Financial Statement, Statement of Income.  The document does not state whether any portion of the fees were paid to Padgett for legal services.

[58] The Padgett Claim includes a verification executed under penalty of perjury by general counsel on behalf of Padgett.  See Padgett Claim at 3.

36

funds that previously had been garnished by CIMA Group.  <u>See</u> Padgett Claim at ¶¶ 3-4.

Moreover, he also alleges that pursuant to a previously perfected security interest, he "has the

right of possession, <u>and owns all rights, title and interest in all of the assets of CWNevada</u>,

including but not limited to all personal property, accounts, <u>money, deposit accounts, products</u>

<u>and the proceeds therefrom</u> that existed or acquired afterwards."  (Additional emphasis added).

<u>Id.</u> at ¶ 5.  Assuming these representations are accurate, Padgett at one time, or perhaps

continuously, has provided legal services to an entity whose operations have resulted in nine

separate lawsuits that are pending in various stages in State Court.  <u>See</u> Padgett Declaration at ¶¶

8, 14 and 15.[59]  More important, despite apparently perfecting only a security interest in the

assets of the Debtor, he has made a verified claim in State Court that he actually owns all of the

assets of the Debtor.  In essence, the record before this court indicates that Padgett has taken

positions that may be in actual and direct conflict with the interests of the Debtor, and that he

also may be subject to claims by the Debtor that would be property of the bankruptcy estate.

The necessity of independent counsel to advise the Debtor is amply demonstrated by the

record.  While the Debtor is a limited liability company that, according to the Chapter 11

Petition, is managed by BCP Holding, as the managing member of the Debtor, <u>see</u> Resolution

Authorizing Bankruptcy attached to Petition, it apparently is managed by a board of directors

consisting of Padgett, Van Oyen, and Jennifer Lazovich.  <u>See</u> 2018 Padgett Declaration at ¶ 3.

Van Oyen had a twenty percent (20%) membership interest in the Debtor as of the end of 2015,

<u>see</u> note 53, <u>supra</u>, and remains a member of the Debtor at this time.  <u>See</u> Van Oyen Affidavit at

¶ 2.  In addition to the board members he identifies, Padgett attests that the Debtor had two

"shadow" directors, who apparently represented members of the Highland Partners and Green

Pastures groups that purchased various promissory notes from the Debtor.  <u>See</u> 2018 Padgett

Declaration at ¶ 4.  Whatever may be the validity or source of the alleged intrigue in the

management of the Debtor, there is no dispute that Van Oyen joined in the Receivership

Application brought in State Court by 4Front and also joins in the instant Dismissal Motion.

_____

[59] As late as September 5, 2018, it appears that as the attorney for the Debtor, Padgett
prepared his own declaration that was filed in State Court.  <u>See</u> 2018 Padgett Declaration at ¶ 1.

Thus, there appears to be no consensus amongst the Debtor's management in favor of Chapter 11 relief.[60]

Notwithstanding the significant issues concerning management, the record also suggests that the Debtor's financial woes have been understated by that management. No one disputes that the April 23, 2019 payment was made to NDOT in the amount of $81,850. <u>See</u> Padgett Declaration at ¶ 13.[61] That is a significant sum. The record also suggests, however, that as of May 3, 2019, the balance owing by the Debtor was $405,076.91. <u>See</u> Van Oyen Affidavit at ¶ 4. In other words, the tax payment made by the Debtor seven days after filing the Chapter 11 petition barely made a dent in the amount likely owed to the State of Nevada. Additionally, no one disputes that the Debtor is the subject of an eviction proceeding for "a commercial lease which is critical to the CWNevada's operations." Padgett Declaration at ¶ 15. The record also suggests that as of May 3, 2019, the Debtor was $117,500 in arrears as to that commercial lease of the dispensary premises located at 6540 Blue Diamond Road in Las Vegas, in addition to related obligations. <u>See</u> Van Oyen Affidavit at ¶¶ 5 and 6. Management simply ignores or apparently is unaware that a Chapter 11 debtor in possession is required to perform its obligations under any unexpired lease of commercial real property, particularly the payment of

---

[60] Given the infighting amongst the Debtor's board of directors, including the alleged "shadow directors," it is not surprising that communications devolved into childishness immediately before the Chapter 11 petition was filed. <u>See</u> Padgett Email ("Since we are coming to the end of this clown convention, I'll tell you, smartest thing Jannotta did was not joining in on this one. I doubt any of you are fit to hold licenses. Heat's about to turn up boys."). Notwithstanding the churlish tone of the email, it is not clear whether it was sent on behalf of the Debtor, as counsel for the Debtor, or, on behalf of the author.

[61] That payment was made seven days after the Debtor commenced this Chapter 11 proceeding. If Padgett owns all of the Debtor's money, as he claims, those funds must have been borrowed from Padgett, or was an additional capital contribution, either of which was subject to prior court approval under Section 364(b). If Padgett has only a security interest in the Debtor's assets, then the funds likely constitute "cash collateral" under Section 363(a) that cannot be used without consent or prior court approval under Section 362(c)(2). If other creditors assert a security interest or lien against the same assets, then the funds also cannot be used by the Debtor except with the consent of those creditors or prior court approval. A bankruptcy trustee, of course, can thoroughly investigate these assertions by waiving the attorney-client privilege of a non-individual debtor. <u>See</u> discussion at note 42, <u>supra</u>.

scheduled rent.  See 11 U.S.C. § 365(d)(3).

The court has considered the role of the "unclean hands" doctrine in a bankruptcy case involving a marijuana-related debtor and the many parties that willingly do business with such an entity.  It is clear that the Marijuana Business of this Debtor is not authorized under the Controlled Substances Act.  It is equally clear that 4Front is a "national consultant in the cannabis industry," see note 6, supra, and therefore has potential legal exposure under the Controlled Substances Act.  Compare Rent-Rite (voluntary Chapter 11 dismissed based on gross mismanagement and unclean hands of the debtor), with Medpoint Mgmt. (involuntary Chapter 11 dismissed based on, *inter alia*, unclean hands of petitioning creditors who did business with marijuana-related alleged debtor).  Likewise, Highland Partners, Green Pastures, Van Oyen, MC Brands, and CIMA Group have potential legal exposure.  See note 14, supra.  When all sides to a pending dispute may be accused of wrongdoing, a court in equity may simply deny relief to all sides and dismiss the case.  See, e.g., Green v. Higgins, 535 P.2d 446 (Kan. 1975) (denial of both claims and counterclaims on finding that the conduct of both plaintiff and defendant had been willful, fraudulent, illegal, and unconscionable).  But bankruptcy courts, like all courts, are required to consider the circumstances of each case rather than routinely dismissing entire swaths of petitions and requests filed by parties seeking legal relief.[62]  Public confidence and the integrity of the court, see note 44, supra, require no less.  Thus, the court is not convinced that the "unclean hands" doctrine has an appropriate role in this case.

There may be cases where Chapter 11 relief is appropriate for an individual or a non-individual entity directly engaged in a marijuana-related business.  For the reasons discussed above, this case is not one of them.

For the same reasons, the court instead concludes that the interests of creditors and the Debtor would be better served by dismissal of the case.  See 11 U.S.C. § 305(a)(1).  The parties may return to State Court where the Receivership Application, among other matters, may be fully addressed.  Having reached this conclusion, it is unnecessary to address 4Font's alternative

---

[62] If there are 8,700 residents of Nevada employed by the marijuana industry, see discussion at note 52, supra, then the impact of automatically denying a bankruptcy fresh start to those residents and their dependents would be unconscionable.

request for dismissal under Section 1112(b), as well as the request for appointment of a Chapter 11 trustee under Section 1104(a). Because dismissal of the case results in a termination of the automatic stay under Section 362(c), it also is unnecessary to address 4Front's alternative request for relief from stay.

**IT IS THEREFORE ORDERED** that the Creditor 4Front Advisors LLC's Motion to Dismiss Bankruptcy Petition or, Alternatively, Motion for Relief from the Automatic Stay to Allow Receivership and Contempt Proceedings to Continue, Docket No. 18, be, and the same hereby is, **GRANTED**.

**IT IS FURTHER ORDERED** that the above-captioned Chapter 11 proceeding is **DISMISSED** pursuant to 11 U.S.C. § 305(a)(1).

**IT IS FURTHER ORDERED** that all pending hearings in connection with the above-captioned Chapter 11 proceeding are **VACATED**.

Copies sent via CM/ECF ELECTRONIC FILING

Copies sent via BNC to:

CWNEVADA LLC
ATTN: OFFICER OR MANAGING AGENT
4145 ALI BABA LANE, SUITE A
LAS VEGAS, NV 89146

# # #

40